Gretchen Freeman Cappio, *pro hac vice* forthcoming
Ryan McDevitt, *pro hac vice* forthcoming
Adele A. Daniel, *pro hac vice* forthcoming
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
adaniel@kellerrohrback.com

Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ERNESTO DEL BARRIO JR. AND OWEN
WILLIAMS, on behalf of themselves and all others
similarly situated,

                             Plaintiffs,

    v.

DR. ING. H.C. F. PORSCHE AG, and PORSCHE
CARS NORTH AMERICA, INC.,

                           Defendants.

No. 3:20-cv-7341

**COMPLAINT
CLASS ACTION**

**DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

1.    Plaintiffs **Ernesto Del Barrio Jr.** and **Owen Williams**, individually and behalf of all others similarly situated, allege the following against Defendants Dr. Ing. h.c. F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. (collectively, "Porsche"), based on personal knowledge, information and belief, and/or the investigation of counsel.

## II.    NATURE OF THE ACTION

2.    Five years after the 2015 scandal surrounding Volkswagen Group's installation of "Defeat Devices" in Volkswagen, Audi, and Porsche diesel vehicles that unlawfully concealed from regulators and consumers the true and illegally-high levels of pollutants these vehicles emitted, and following the discovery of a similar device in Audi gasoline vehicles, another "Defeat Device" embedded in numerous Porsche vehicles during emissions testing has just come to light.

3.    Despite Volkswagen's promises to "come clean" and to be honest about its past mistakes in 2015, its subsidiary Porsche apparently persisted in concealing its emission-testing deception for its high-end 911 and Panamera vehicles.

4.    This nationwide class action concerns the deception of Porsche consumers stemming from the manipulation of federal and California emissions testing for Porsche cars in the U.S. market. Simply put: this is a consumer action brought by consumers regarding Porsche's deceitful conduct. This is not an action to enforce clean air laws.

5.    New reporting reveals that Porsche deliberately modified the transmissions of test vehicles so that they emitted fewer pollutants during testing than the actual cars it sold to consumers would emit during normal use.

6.    While cheating emissions testing, Porsche held itself out to consumers in marketing and publications as a responsible corporation that valued the environment and complied with the law. Porsche says, "We develop, produce, sell and service high-quality, exclusive sports cars that feature the highest level of environmental and safety technology,"[1] and that its engines are "powerful and dynamic, efficient and clean."[2]

---

[1] "Porsche has reduced CO2 emissions by 75% since 2014," April 5, 2019, https://newsroom.porsche.com/en/2019/company/porsche-sustainability-reduction-co2-emissions-energy-consumption-production-17439.html (last visited October 14, 2020).

[2] Press Release: Porsche Shares More Panamera Innovations, March 18, 2009, https://www.autoblog.com/2009/03/18/u-s-porsche-panamera-to-get-start-stop-active-aero-among-other/ (last visited October 14, 2020).

7.    Porsche represented in vehicle manuals and warranties that the vehicles' emissions complied with federal and state emissions requirements, even though Porsche had manipulated emissions testing. Porsche represented to consumers and regulators that these vehicles offered excellent performance in combination with legal, clean emissions; in truth, those characteristics were mutually exclusive.

8.    While undergoing emissions testing, the vehicles sacrificed performance in order to artificially limit emissions. The vehicles as actually manufactured, distributed, and sold to consumers, however, drove as advertised but emitted higher levels of pollution than the test vehicles and thus higher than the levels to which the vehicles were certified.

9.    Instead of delivering on their promises to consumers of high performance coupled with low or compliant emissions, Porsche devised a way to make it appear that their cars did what they said they would when, in fact, they did not. Put simply, Porsche lied to consumers and regulators alike and continued to lie for over a decade.

10.    On information and belief, Porsche manipulated emissions testing for the 2010–2016 model year Porsche Panamera and 2009–2016 model year Porsche 911 with both manual and PDK transmissions. These vehicles are hereinafter referred to as the "Class Vehicles."

11.    Because of Porsche's actions, the Class Vehicles are not what it promised. Instead, a difference in features exists between the Porsche vehicles *as-marketed* and the Porsche vehicles *as-sold.* The vehicles as-sold pollute the atmosphere with higher levels of carbon dioxide than the vehicles as-marketed and than would have been permitted by federal and state environmental protection requirements. If Porsche had sold the vehicles as they had been manipulated for testing, they would have had the lower performance of the test vehicles and would not have delivered the advertised high performance without polluting at an elevated level.

12.    Plaintiffs and Class Members overpaid for the Class Vehicles at the time of purchase, because the features of the as-sold vehicles were less valuable than the features of the as-marketed

vehicles. Accordingly, current values of Class Vehicles are lower than they would be if the vehicles had been delivered in as-marketed condition, rather than their as-sold conditions. The overpayment at the time of purchase and lower current value of the Class Vehicles are directly attributable to Porsche's actions, which created material differences in features between the vehicles as-marketed and as-sold.

13.     Porsche's conduct here occured outside the bounds of the market, since consumers inherently transact for emission-compliant vehicles, and Porsche concealed the true nature of the Class Vehicles.

14.     At the point of purchase, Porsche deprived Plaintiffs and the Class of the opportunity to acquire the vehicles' performance characteristics, as represented by Porsche, without also acquiring the severe emissions defect alleged herein.

### III.     PARTIES

**A.          Plaintiffs**

15.     On April 2, 2016 **Ernesto Del Barrio Jr.,** a resident of California, purchased a used 2012 Porsche 911 Carrera for approximately $56,000 in a private transaction. Plaintiff's vehicle's mileage was approximately 26,967 at the time of purchase. Plaintiff did not, and could not, know that Porsche had manipulated emissions testing. Porsche's misrepresentations and omissions about its manipulation of emissions testing were material to Plaintiff's purchase, and Plaintiff relied on them in purchasing the vehicle. Had Porsche revealed its emissions-testing manipulation, Plaintiff would not have purchased the vehicle, or would have paid less for the vehicle. Porsche's conduct caused Plaintiff damage in the form of overpayment and diminished value.

16.     In November 2014, **Owen Williams,** a resident of New Jersey, purchased a new 2015 Porsche Carrera for approximately $120,000 from Princeton Porsche in Lawrence Township, New Jersey. Plaintiff did not, and could not, know that Porsche had manipulated emissions testing. Porsche's misrepresentations and omissions about its manipulation of emissions testing were material to Plaintiff's purchase, and Plaintiff relied on them in purchasing the vehicle. Mr. Williams has been a

loyal and enthusiastic Porsche customer for years, and previously owned several other Porsche-brand vehicles. He was therefore especially disappointed to learn that his Class Vehicle was sold under false pretenses. Had Porsche revealed its emissions-testing manipulation, Plaintiff would not have purchased the vehicle, or would have paid less for the vehicle. Porsche's conduct caused Plaintiff damage in the form of overpayment and diminished value.

**B.      Defendants**

17.      Dr. Ing. h.c. F. Porsche AG is incorporated under the laws of Germany and headquartered in Stuttgart. It is a subsidiary of Volkswagen AG. The Class Vehicles are manufactured in Stuttgart (911 models) and Leipzig (Panamera models), Germany. Porsche AG directs the operations of Porsche Cars North America, which acts as its agent in the United States. As a result, this Court has specific jurisdiction over Porsche AG.

18.      Porsche Cars North America, Inc., is a corporation doing business in every state and the District of Columbia and is organized under the laws of Delaware with its principal place of business at One Porsche Drive, Atlanta, Georgia. Porsche Cars North America is therefore a citizen of Delaware and Georgia. *See* 28 U.S.C. § 1332(d)(10).

19.      At all relevant times, Porsche AG and Porsche Cars North America, Inc. manufactured, distributed, sold, leased, and warranted the Vehicles under the Porsche brand name throughout the United States. Porsche AG and Porsche Cars North America, Inc. also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Vehicles.

## IV.      JURISDICTION

20.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

21.   This Court has personal jurisdiction over Porsche Cars North America because it conducts business in California and has sufficient minimum contacts with California.

22.   This Court has personal jurisdiction over Porsche AG because it has purposefully availed itself of this forum by directing its agent and distributor, Porsche Cars North America, to act here.

23.   Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Porsche caused harm to Class members residing in this District.

## V.   INTRADISTRICT ASSIGNMENT

24.   This action should be assigned to the San Francisco or Oakland Divisions because a substantial part of the events or omissions which give rise to the claims occurred in San Francisco county, where Plaintiff Del Barrio resides and where the property that is the subject of his legal claims—his Class Vehicle—is located, and where Porsche Cars North America conducts, and Porsche AG directs, substantial business, including with and through at least six Porsche dealerships.

## VI.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.   Porsche manipulated emissions testing for carbon dioxide.**

25.   German newspaper *Bild am Sonntag* reported on August 23, 2020 that Porsche had launched an internal investigation into the possible manipulation of its vehicles to improve emissions test data.

26.   Porsche contacted the German KBA and U.S. EPA, the authorities responsible for emissions regulations in each country. KBA announced it was investigating.

27.   *Bild am Sonntag* initially reported that certain Porsche models were being investigated for suspected illegal changes to hardware and software affecting exhaust systems and engine components designed to emit fewer pollutants during testing than vehicles sold to consumers would. A Porsche spokesperson explained that the investigation would "mainly relate to specific hardware and

software used in certification testing." Porsche reported that it had discovered the issues in a "routine" review of technical and regulatory aspects of its vehicles.

28.     Further details emerged as a whistleblower reportedly described suspected irregularities in the transmissions installed in the vehicles used for emissions testing. The KBA said its investigation focused on whether Porsche used the same components in production as in the cars that were tested during regulatory approval.

29.     In early October 2020, the public prosecutor in the Stuttgart region, where Porsche AG is headquartered, began to investigate four Porsche allegations of tampering with emissions testing.

30.     Then, Porsche further revealed that the emissions cheating came to light in an investigation into illegal violations in the company in the wake of the prior diesel-emissions cheating scandals at Porsche and its corporate parent, Volkswagen, and sibling, Audi.

31.     And Business Insider reported the manner of Porsche's deception: Porsche installed different gears in test vehicles' transmissions than those it installed in production vehicles. Test vehicles had a longer gear ratio than those actually sold to consumers. A longer gear ratio means lower fuel consumption (and slower acceleration), which in turn means fewer $CO_2$ emissions. In the vehicles actually sold or leased to consumers, Porsche used shorter gear ratios, which meant those cars performed better but also emitted more $CO_2$ than the test vehicles had.

32.     According to Business Insider's reporting, Porsche employees have confirmed this gear-ratio swap in internal surveys.

33.     Thus, on information and belief, Porsche manipulated emissions testing for the 2010–2016 model year Porsche Panamera and 2009–2016 model year Porsche 911 with both manual and PDK (Porsche's name for dual-clutch automatic) transmissions. The list of vehicles for which Porsche manipulated emissions testing may grow or change as the investigation by Plaintiffs' counsel proceeds.

34.     Porsche's illegal actions have caused Plaintiffs and Class Members significant harm. Even if Porsche were to repair Class Vehicles so that they emitted pollutants at the same level as the

test vehicles did, the repair would not compensate Plaintiffs and the Class for the significant harm Porsche deception has caused, for three reasons:

A.      First, any repairs performed as part of a recall are likely to diminish the performance of the Class Vehicles, which cannot equal the test vehicles' emissions while achieving the same power and fuel economy. Plaintiffs' and Class Members' Class Vehicles will therefore not perform as advertised if "repaired" in this manner.

B.      Second, even if a more functional repair were possible, it could not compensate for the financial damages Plaintiffs and Class Members have suffered, including the high prices Plaintiffs and the Class paid to own high-performing, luxurious Porsche-branded vehicles that complied with emissions requirements and comported with Porsche's advertised commitment to the environment, as well as the inevitable reduction in resale value caused by any recall to repair the vehicles and any resulting diminished performance.

C.      Third, Plaintiffs and Class members are already experiencing harm as unwilling vectors for Porsche's pollution-producing vehicles.

**B.      This scheme is just the most recent in a series of emissions-related deceptions for Porsche and its parent company, Volkswagen.**

35.      Unfortunately, these new revelations are hardly surprising. Porsche and its parent company, Volkswagen, cheated emissions testing for millions of vehicles over the last decade and even as far back as 1974, when Volkswagen paid a $120,000 to the EPA to settle charges that it gamed pollution control systems.

36.      The story of Volkswagen's 2015 diesel Defeat Device scandal is now well known: Volkswagen and its subsidiaries Audi and Porsche installed software that used signals like whether the steering wheel was being turned to recognize when vehicles were undergoing emissions testing and operated the vehicles' emissions control systems at compliant levels only during testing. Under normal operating conditions, these emissions control systems were deactivated or operated at lower levels,

resulting in increased performance and fuel efficiency but vastly increased—and illegal—levels of oxides of nitrogen. In the autumn of 2015, the EPA and California Air Resources Board (CARB) issued Notices of Violation for these Defeat Devices, and both private and government litigation ensued. Judge Breyer of this District granted final approval of a multibillion-dollar settlement resolving many consumers' claims relating to 2.0-liter diesel engines on October 25, 2016. But the manipulation was not limited to 2.0-liter vehicles: 3.0-liter engines in larger vehicles were also implicated, including the only diesel model Porsche sells in the United States: the Cayenne SUV. Volkswagen, Audi, and Porsche reached another billion-dollar settlement to resolve consumers' claims in that litigation. Final approval of that settlement was granted on May 17, 2017.

37.     CARB then discovered another Defeat Device, this time on several Audi models, including gasoline-powered vehicles, equipped with a certain 8-speed automatic transmission. Like the Defeat Devices used in the diesel vehicles, that device used engine and transmission management software to reduce carbon dioxide emissions during test cycles, but not during normal operation. Audi was again sued by consumers and, ultimately, a settlement was approved on February 28, 2020.

38.     On top of the billions of dollars Volkswagen, Audi, and Porsche have had to pay in recent years to resolve consumer claims and government fines in both the United States and Europe for their emissions-related deceptions, numerous executives have faced prosecution or been terminated. Among them was Volkswagen's former CEO, Martin Winterkorn, who was terminated shortly after the Dieselgate scandal came to light in September 2015. Winterkorn was replaced by Matthias Müller, promoted from CEO of Porsche AG to CEO of Volkswagen AG. According to the *New York Times*, Müller was "a high-ranking executive involved in product development at the same time that the company was developing the illegal software and deploying it in vehicles," and had worked closely with some of the executives who faced criminal investigations and prosecutions for their roles in the

deception.[3] Müller was CEO of Porsche from October 2010-September 2015, when most the manipulation in this complaint allegedly occurred. In turn, Müller was fired in 2018 and replaced by a new CEO who did not have any connection to the emissions scandals, having arrived at Volkswagen only shortly before the scandal broke. *Id.*

39.     Although Porsche continues to conceal the precise functioning of its defeat device used in test vehicles, Porsche's device achieves the same effect as Volkswagen's other schemes: during emissions testing, vehicles exhibit higher fuel economy and emit lower amounts of carbon dioxide than vehicles in actual use do.

40.     In order to sell vehicles that are literally too good to be true—that is, vehicles that offer fuel economy or performance that Volkswagen and its subsidiaries could not achieve while complying with emissions standards—Volkswagen and its subsidiaries Audi and Porsche have repeatedly cheated emissions testing across many years, several brands, many classes of vehicles, various engine and transmission types, and by several mechanisms. The Class Vehicles are just the newest example.

**C.     Applicable standards and testing**

41.     Porsche's fraudulent scheme was motivated by the desire to reduce its fleet-wide average carbon emissions in order to comply with federal and state requirements for automotive manufacturers in the United States, while still being able to offer high performance in its signature sports car—the 911—and popular sports sedan—the Panamera.

42.     Carbon dioxide is a significant greenhouse gas, and the excessive emission of carbon dioxide is a major cause of global warming and ocean acidification. For this reason, emissions of carbon dioxide by vehicles sold in the United States and California are regulated by the EPA and CARB.

---

[3] Jack Ewing, "*Volkswagen Set to Oust Matthias Müller as CEO After Diesel Scandal*,." ~~*New York Times*~~N.Y. Times, April 10, 2018,. https://www.nytimes.com/2018/04/10/business/volkswagen-matthias-muller.html ~~(last visited October 14, 2020)~~.

43.     In 2006, CARB implemented regulations to control the emissions of greenhouse gases from new light- and medium-duty motor vehicles in California. The standards phased in from 2009 to 2016 and were incorporated into California's low emission vehicle legislation.

44.     These regulations applied on a fleet-wide basis to passenger cars (among other vehicles). For each model year, a manufacturer could choose the standards to which each of its vehicles were tested and certified, but the manufacturer's entire fleet had to meet a specific average emissions level. Because Porsche sold early-model Class Vehicles in California at the time, it had to comply with these emissions levels.

45.     In 2010, EPA and the Department of Transportation's National Highway Traffic Safety Administration (NHTSA) finalized a joint rule to establish a national program of greenhouse gas emissions standards under the Clean Air Act. The standards applied to new passenger cars, light-duty trucks, and medium duty passenger vehicles, covering model years 2012 through 2016. The standards required these vehicles to meet more stringent targets each model year, with an estimated combined average emissions level of 250 grams of carbon dioxide ($CO_2$) per mile in model year 2016. CARB's regulations were revised to accept compliance with these federal standards as compliance with California's standards for these model years.

46.     Like CARB's regulations had, the federal rules set standards for fleet-wide averages. The national program allowed automobile manufacturers to build a single light-duty national fleet that satisfied the requirements of federal programs as well as the standards of California and other states that adopted its standards. The standards were based on $CO_2$ emissions-footprint curves, where each vehicle had a different $CO_2$ emissions compliance target, depending on its footprint value. As long as the average emissions of an auto manufacturer's fleet met the applicable standard, it could offer whatever vehicles it chose.

47.     Emissions from Porsche's 2010–2016 model-year Class Vehicles were counted in its fleet-wide average for the purposes of complying with these regulations.

48.     Although the government agencies determined that there were a wide range of technologies available for manufacturers to use when upgrading vehicles to reduce greenhouse gas emissions, auto manufacturers experienced pressure to comply while offering the same vehicle performance and out-selling the competition. But instead of facing this technological challenge as a responsible and innovative corporation would, Porsche decided to cheat.

49.     By cheating emissions testing for Class Vehicles, Porsche was able to fraudulently lower its fleet-wide average, allowing it to sell, for a premium, high-performance vehicles in the United States from 2009 to 2016. Specifically, Porsche's emissions-testing manipulation enabled it to sell the following Class Vehicles without actually meeting federal and state emissions requirements:

| Panamera | |
|---|---|
| Model Year | Number Sold |
| 2010 | 7,741 |
| 2011 | 6,879 |
| 2012 | 7,614 |
| 2013 | 5,421 |
| 2014 | 5,740 |
| 2015 | 4,985 |
| 2016 | 4,403 |
| *Total* | 42,783 |

| 911 | |
|---|---|
| Model Year | Number Sold |
| 2009 | 6,839 |

| 2010 | 5,737 |
|---|---|
| 2011 | 6,016 |
| 2012 | 8,528 |
| 2013 | 10,442 |
| 2014 | 10,446 |
| 2015 | 9,858 |
| 2016 | 8,901 |
| *Total* | 66,767 |

50.     Absent its cheating, Porsche would have had to innovate in order to make high-performance vehicles that actually allowed it to meet fleet-wide emissions averages. Or, Porsche could have sold vehicles that operated as the test vehicles did. Or, it could have modified other vehicles in its fleet, or sold different vehicles, in order to meet the required fleetwide emissions averages. Or, Porsche could have exited the United States market. But instead, Porsche, like its corporate parent Volkswagen and sibling Audi, decided to cheat emissions standards—designed to protect human health and the environment—for its own profit and at the expense of consumers.

**D.     Porsche misrepresented and omitted material facts about its emissions-testing manipulations.**

51.     Porsche advertises itself as an environmentally-conscientious corporation that produces efficient, emissions-compliant, luxury, high-performance vehicles. Among other commitments, Porsche promises that "Protection of the environment and resource conservation are also major priorities for Porsche."[4] It boasts that "Porsche is on course for success when it comes to sustainability.

---

[4] Porsche Sustainability and Responsibility, https://www.porsche.com/international/aboutporsche/jobs/profile/sustainability/ (last visited October 14, 2020).

The sports car manufacturer has reduced the CO2 emissions per vehicle by more than 75 percent since 2014."[5]

52.     Porsche claimed that "As a manufacturer of exclusive, powerful sports cars, Porsche is committed to achieving greater acceptance of its company and products around the world through socially and environmentally responsible conduct"[6]—even as it manipulated emissions testing for Class Vehicles.

53.     Porsche said that "Although it designs the sports cars of the future, Porsche is already firmly committed to reducing carbon dioxide ($CO_2$) and particulate matter (PM) in today's vehicles."[7]

54.     It claimed that "We develop, produce, sell and service high-quality, exclusive sports cars that feature the highest level of environmental and safety technology and exude a great fascination."[8]

55.     Porsche also represents that it complies with the law. Its website describes the approach it takes to "ensure that all company activities comply with the respective laws, internal rules, values and agreements."[9] Other material says, "It goes without saying that Porsche meets all applicable environmental regulations."[10]

56.     After the diesel scandal broke in 2015, Porsche's parent company promised to "make things right" and to "win back the trust of its customers. But several subsequent scandals revealed

---

[5] "Porsche has reduced CO2 emissions by 75% since 2014," April 5, 2019, https://newsroom.porsche.com/en/2019/company/porsche-sustainability-reduction-co2-emissions-energy-consumption-production-17439.html (last visited October 14, 2020).

[6] 2016–17 Environmental Statement at 1, https://newsroom.porsche.com/en/sustainability/porsche-environmental-statement-2017-site-zuffenhausen-15967.html (last visited October 14, 2020) (hereinafter "Environmental Statement"). ~~.~~

[7] ~~2016-2017~~ Environmental Statement at 1.

[8] ~~2016-17~~ Environmental Statement at 14.

[9] Porsche Sustainability and Responsibility, https://www.porsche.com/international/aboutporsche/jobs/profile/sustainability/

[10] ~~2016-17~~ Environmental Statement at 14.

emissions cheating devices in other vehicles. Far from coming clean, Porsche continued to cheat on emissions testing, and continued to cover it up.

57.     In marketing materials, Porsche advertised the environmental friendliness of Class Vehicles. For example, a 2012 Press Release said that "For 2012, the 911 has been completely redesigned from the ground up. The newest incarnation applies singular balance to the priorities of a new era, preserving the classic 911 lines, yet revisiting every inch for advances in power and fuel economy."[11] Similarly, a 2009 Press Release for the Panamera advertised that "Using both new and proven technologies, Porsche's engineers in Weissach while developing the Panamera have succeeded in intelligently solving all conflicts of interest. The result is a car with a wide range of features most appropriate for such an outstanding gran turismo: the engines are powerful and dynamic, efficient and clean."[12]

58.     Porsche's brochures claimed that "$CO_2$ emissions have been reduced" by significant percentages over previous models.[13] It promised "excellent performance at the same time as greater efficiency" in "an era of intensifying debate about global climate change and $CO_2$ emissions." At Porsche, the brochure says, "technological developments are carried out with environmental protection in mind." "The goal is to enhance performance—but, where possible, not at the expense of the environment."

59.     The brochures further promised that "Vehicles manufactured by Porsche demonstrate that even high-performance sports cars can achieve moderate fuel consumption and exhaust emission values in their respective category."

---

[11] Porsche, "Press Release: New Seventh-Generation Porsche 911 On-Sale Now," February 6, 2012, https://press.porsche.com/prod/presse_pag/PressResources.nsf/Content?ReadForm&languageversionid=862041&hl=modelle-911-911_carrera_s (last visited October 14, 2020).
[12] Press Release: Porsche Shares More Panamera Innovations, March 18, 2009, https://www.autoblog.com/2009/03/18/u-s-porsche-panamera-to-get-start-stop-active-aero-among-other/ (last visited October 14, 2020).
[13] http://www.motorologist.com/wp-content/uploads/2014-Porsche-911-brochure.pdf (last visited October 15, 2020).

60.     In Class Vehicles' owner's manuals, Porsche claims that "The emission control system detects malfunctions that could cause increased pollutant emissions or consequential damage etc. well in advance," but does not disclose that the Class Vehicles emit carbon dioxide at higher levels than they were certified to as a result of their deception in regulatory testing.[14]

61.     Porsche's Class Vehicles' manuals further represented to Plaintiffs and Class members that "In the interest of clean air Pollution of our environment has become a problem that is of increasing concern to all of us. We urge you to join us in our efforts for cleaner air in controlling the pollutants emitted from the automobile. Porsche has developed an emission control system that controls or reduces those parts of emissions that can be harmful to our environment. Your Porsche is equipped with such a system. Porsche warrants the Emission Control System in your new car under the terms and conditions set forth in the Warranty Booklet."[15]

62.     Finally, Porsche's New Vehicle Warranties specifically "warrant[ed] to the owner of this car that the automobile was designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture."

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Discovery Rule

63.     The tolling doctrine was made for cases of concealment like this one. Any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

64.     Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and Class members could not have discovered that Porsche manipulated the emissions testing of its vehicles.

---

[14] 911 Carrera manual, 911 Turbo manual, and Panamera manual, at 114
[15] 911 Turbo manual, at 255; Panamera manual, at 262.

65.     The first hint of Porsche's emissions manipulation came to light in August 2020, when a German newspaper reported the internal investigation. To this date, Porsche not disclosed the full nature and scope of its deception.

66.     Plaintiffs and Class members could not reasonably discover, and did not know of facts that would have caused a reasonable person to suspect, that Porsche intentionally failed to report information within its knowledge to federal and state authorities, dealerships, or consumers.

67.     Likewise, a reasonable and diligent investigation could not have disclosed that Porsche had information in its possession about the existence of its sophisticated emissions deception and that it concealed that information.

**B.      Tolling due to fraudulent concealment**

68.     Throughout the relevant time period, all applicable statutes of limitation have been tolled by Porsche's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

69.     Instead of disclosing its deception, or that the emissions from Class Vehicles were worse than test vehicles had, Porsche falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

**C.      Estoppel**

70.     Porsche had a continuous duty to tell the truth about its products and to disclose to Plaintiffs and the other Class members the facts that it knew about the emissions from Class Vehicles and its manipulation of emissions testing.

71.     Although it had the duty throughout the relevant period to disclose to Plaintiffs and Class members that it had engaged in the deception described in this Complaint, Porsche chose to evade federal and state emissions and clean air standards applicable to the Class Vehicles, and

intentionally misrepresented its blatant and deceptive lack of compliance with federal and state law regulating vehicle emissions and clean air.

72.     Thus, Porsche is estopped from relying on any statutes of limitations in defense of this action.

## VIII.   CLASS ACTION ALLEGATIONS

**A.     The Class**

73.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes:

**Nationwide class:**

All persons or entities in the United States who are current or former owners and/or lessees of Class Vehicles.

**California class:**

All persons or entities in California who are current or former owners and/or lessees of Class Vehicles.

**New Jersey class:**

All persons or entities in New Jersey who are current or former owners and/or lessees of Class Vehicles.

74.     Excluded from the Class are individuals who have personal injury claims resulting from Porsche's emissions manipulation. Also excluded from the Class are Porsche and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and judges to whom this case is assigned and their immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

75.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

76.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**B.      Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

77.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than tens of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but it may be ascertained from Porsche's records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**C.      Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

78.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    A.      Whether Porsche engaged in the conduct alleged in this Complaint;

    B.      Whether Porsche designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    C.      Whether the Porsche manipulated government emissions testing;

    D.      Whether the Class Vehicles could have been made to comply with government standards without substantially degrading the performance of the Vehicles;

    E.      Whether Porsche knew it had manipulated emissions testing for Class Vehicles and, if so, how long Porsche has known;

    F.      Whether Porsche' conduct violates consumer protection statutes, common law fraud, warranty laws, and other laws as asserted in this Complaint;

    G.      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

H.       Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

I.       Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

J.       Whether Porsche continues to unlawfully conceal and misrepresent whether testing was manipulated as to additional vehicles, besides those reported in the press to date.

**D.    Typicality: Federal Rule of Civil Procedure 23(a)(3)**

79.      Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Porsche's wrongful conduct as described above.

**E.    Adequacy: Federal Rule of Civil Procedure 23(a)(4)**

80.      Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute the action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

81.      Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

**G.    Superiority: Federal Rule of Civil Procedure 23(b)(3)**

82.      A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be

required to individually litigate their claims against Porsche, so it would be impracticable for Class members to individually seek redress for Porsche's wrongful conduct.

83.     Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IX.     CLAIMS FOR RELIEF

### A.     Nationwide claims

## COUNT ONE — COMMON LAW FRAUD

84.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

85.     Plaintiffs assert this cause of action on behalf of themselves and Class members.

86.     Porsche made affirmative misrepresentations, half-truths, and concealed the truth. Porsche made affirmative misrepresentations and half-truths to, and concealed the truth from, Plaintiffs about its manipulation of emissions testing for Class Vehicles. Porsche emphasized Class Vehicles' legal compliance, environmental-friendliness, and low emissions. Porsche spread these misrepresentations and omissions through marketing campaigns, other publications, vehicle manuals, and vehicle warranties.

87.     Porsche's misrepresentations, half-truths, and omissions were false. Porsche manipulated required emissions testing of Class Vehicles to evade government emissions requirements. The transmissions in the test vehicles were altered to cheat emissions-certification testing, so that the vehicles would show lower emissions when tested than the Class Vehicles actually sold to consumers emit. The result was as Porsche intended: vehicles passed emissions certifications

by deliberately inducing misleading readings under test conditions. They were not in fact designed to conform at the time of sale with emissions requirements.

88.     Porsche knew its representations and omissions were false and took intentional steps to conceal that knowledge. Porsche were aware that it manipulated emissions testing for Class Vehicles. This deception continued even as Volkswagen apologized for other broad defeat-device scandals.

89.     Porsche had a duty to disclose its deception because it had exclusive knowledge and access to information about its intentional deception and the implementation and maintenance of that deception. Porsche also had a duty to disclose because it made affirmative representations and incomplete representations about the quality of Class Vehicles, their emissions, and their compliance with laws, and intentionally concealed their deception from consumers and regulators. This duty applied at the time of purchase and extends to this day. Porsche intended for plaintiffs to rely on its representations and omissions.

90.     Porsche intended for Plaintiffs and Class members to rely on Porsche's representations and omissions. Porsche's acts were done wantonly, maliciously, oppressively, and deliberately, with intent to defraud Plaintiffs and Class members and in reckless disregard of Plaintiffs' and Class members' rights, in order to enrich Porsche and allow it to sell its vehicles in the U.S. market.

91.     Porsche's misrepresentations, half-truths, and omissions were material to Plaintiffs' decision to purchase and drive Class Vehicles. Porsche well knew that its customers, including Plaintiffs and Class members, valued Class Vehicles' high performance; that the Class Vehicles' performance was only made possible by cheating emissions testing; and that Porsche customers would not want performance procured through fraud.

92.     Plaintiffs and Class Members could not have discovered the truth about Porsche's emissions-testing manipulation. Plaintiffs had no way of knowing that Porsche's representations were false and that Porsche had manipulated emissions tests for Class Vehicles.

93.     Plaintiffs reasonably relied on the representations and omissions in purchasing and continuing to drive Class Vehicles. Plaintiffs and Class members were unaware of Porsche's emissions-testing manipulation. Had they known the truth, they would not have acted as they did. Plaintiffs would not have purchased vehicles whose high performance was only made possible through emissions fraud, or would have paid less for them

94.     Plaintiffs and Class members were injured by their reliance on Porsche's misrepresentations and omissions. Porsche's deception came at Plaintiffs and Class members' expense. Plaintiffs and Class members have sustained damages because they purchased vehicles as an inflated cost and own vehicles that are diminished in value because of Porsche's deception. Plaintiffs and Class members have been damaged in an amount to be proven at trial, including but not limited to compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT TWO — UNJUST ENRICHMENT

95.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

96.     Plaintiffs assert this cause of action on behalf of themselves and Class members.

97.     Plaintiffs and Class members conferred a benefit on Porsche by purchasing and owning Class Vehicles without knowledge of Porsche's deception.

98.     Porsche has retained this benefit and knows of and appreciates it.

99.     Porsche was and continues to be unjustly enriched at the expense of Plaintiffs and Class members. Porsche should be required to disgorge this unjust enrichment.

100.     Porsche has not fully disclosed its deception and continues to defraud Plaintiffs and Class members by concealing material information about its emissions-testing manipulation. Porsche's misconduct continues to this day. Porsche's wrongful conduct is part of a pattern and generalized course of conduct of cheating emissions requirements and testing.

**B.      State claims**

COUNT THREE — **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

101.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

102.    Plaintiff Del Barrio asserts this cause of action on behalf of himself and the California Class.

103.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Porsche has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

104.    Porsche's conduct, as described herein, was and is in violation of the UCL. Porsche's conduct violates the UCL in at least the following ways:

A.      by knowingly and intentionally concealing from Plaintiff and the other California Class members that Porsche manipulated emissions testing for Class Vehicles while obtaining money from Plaintiffs and Class members;

B.      by marketing Class Vehicles as environmentally-friendly and compliant and itself as an environmentally responsible company;

C.      by purposefully installing a different transmission in test vehicles in order to manipulate testing and mislead regulators and consumers into thinking that Class Vehicles emitted less than they did;

D.      by violating federal laws, including the Clean Air Act; and

E.      by violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

105.    As a direct and proximate result of Porsche's violation, Plaintiff Del Barrio and Class members have been damaged.

106.     Plaintiff Del Barrio and California Class members were injured by their reasonable reliance on Porsche's misrepresentations and omissions. Porsche's deception came at Plaintiff's and California Class members' expense. Plaintiff Del Barrio and California Class members have sustained damages because they purchased vehicles as an inflated cost and own vehicles that are diminished in value because of Porsche's deception. Plaintiff Del Barrio and California Class members have been damaged in an amount to be proven at trial, including but not limited to compensatory damages, incidental and consequential damages, and other damages allowed by law.

107.     Plaintiff Del Barrio requests that this Court enter such orders or judgments as may be necessary to enjoin Porsche from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## COUNT FOUR — VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT

108.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

109.     Plaintiff Del Barrio asserts this cause of action on behalf of himself and the California Class.

110.     California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Civ. Code § 1770(a).

111.     Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

112.     Plaintiff Del Barrio and California Class Members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiff and California Class Members, and Porsche are "persons" as defined in Cal. Civ. Code § 1761(c).

113.    As alleged above, Porsche mispresented and concealed its emissions-testing manipulation as to Class Vehicles.

114.    In purchasing or leasing Class Vehicles, Plaintiff Del Barrio and California Class members were deceived by Porsche's failure to disclose that the Class Vehicles could not have been sold or leased to them with the advertised high performance but for Porsche's manipulation, and that Porsche's fleet did not in fact comply with EPA and California emissions standards.

115.    Porsche's conduct was and is in violation of the CLRA. Porsche's conduct violates at least the following enumerated CLRA provisions:

A.    Cal. Civ. Code § 1770(a)(5): Representing that goods have characteristics, uses, and benefits which they do not have;

B.    Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

C.    Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

D.    Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

116.    Porsche knew its representations and omissions were false and took intentional steps to conceal that knowledge. Porsche was aware that it manipulated emissions testing for Class Vehicles. This deception continued even as Volkswagen apologized for other broad defeat-device scandals.

117.    Porsche had a duty to disclose its emissions deception because it had exclusive knowledge and access to information about its intentional deception and the implementation and maintenance of that deception. Porsche also had a duty to disclose because it made affirmative representations and incomplete representations about the quality of Class Vehicles and their emissions, and intentionally concealed its deception from consumers and regulators. This duty applied at the time of purchase and extends to this day.

118.     Porsche's conduct deceived Plaintiff Del Barrio. Plaintiff reasonably relied on the representations and omissions in purchasing and continuing to drive Class Vehicles. Plaintiff and Class members were unaware of Porsche's emissions-testing manipulation. Had they known the truth, they would not have acted as they did. Plaintiff and Class members would not have purchased vehicles whose high performance was only made possible through emissions fraud, or would have paid less for them.

119.     As a direct and proximate result of Porsche's violation, Plaintiff Del Barrio and California Class members have been damaged.

120.     Plaintiff further seeks an order enjoining Porsche's unfair or deceptive acts or practices and any other just and proper relief available under the CLRA.

121.     Plaintiff Del Barrio has sent a letter complying with Cal. Civ. Code § 1780(b).

## COUNT FIVE — VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW

122.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

123.     Plaintiff Del Barrio asserts this cause of action on behalf of himself and the California Class.

124.     California Bus. & Prof. Code § 17500 states:

> It is unlawful for any corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

125.     Porsche caused to be made or disseminated throughout California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Porsche, to be untrue and misleading to consumers, including Plaintiff Del Barrio and California Class members.

Porsche made affirmative misrepresentations and half-truths to, and concealed the truth from, Plaintiff and Class Members concerning its manipulation of emissions testing for Class Vehicles. Porsche spread these misrepresentations and omissions through marketing campaigns, other publications, vehicle manuals, and vehicle warranties.

126.    Porsche violated § 17500 because the misrepresentations and omissions regarding the emissions testing of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

127.    Porsche's misrepresentations, half-truths, and omissions were material to Plaintiff Del Barrio's decision to purchase and drive Class Vehicles. Porsche well knew that its customers, including Plaintiffs and Class members, valued Class Vehicles' high performance; that the Class Vehicles' performance was only made possible by cheating emissions testing; and that Porsche customers would not want performance procured through fraud. Porsche altered the transmissions in test vehicles to cheat emissions-certification testing, so that the vehicles would show lower emissions when tested than the Class Vehicles actually sold to consumers emit. The result was as Porsche intended: vehicles passed emissions certifications by deliberately inducing misleading readings under test conditions. They were not in fact designed to conform at the time of sale with emissions requirements.

128.    Porsche's conduct deceived Plaintiff and Class members. Plaintiff and Class members reasonably relied on the representations and omissions in purchasing and continuing to drive Class Vehicles. Plaintiff and Class members were unaware of Porsche's emissions-testing manipulation. Had they known the truth, they would not have acted as they did. Plaintiff and Class members would not have purchased vehicles whose high performance was only made possible through emissions fraud, or would have paid less for them.

129.    Plaintiff Del Barrio and Class members were injured by their reliance on Porsche's misrepresentations and omissions. Porsche's deception came at Plaintiff's and California Class

members' expense. Plaintiff and California Class members have sustained damages because they purchased vehicles as an inflated cost and own vehicles that are diminished in value because of Porsche's deception. Plaintiff and California Class members have been damaged in an amount to be proven at trial, including but not limited to compensatory damages, incidental and consequential damages, and other damages allowed by law.

130.    Porsche has not fully disclosed its deception and continues to defraud Plaintiff and California Class members by concealing material information about its emissions-testing manipulation. Porsche's misconduct continues to this day. Porsche's wrongful conduct is part of a pattern and generalized course of conduct of cheating emissions requirements and testing.

131.    Plaintiff and Class members requests that this Court enter such orders or judgments as may be necessary to enjoin Porsche from continuing its unfair, unlawful, and deceptive practices and to restore Plaintiff and Class members any money acquired by its unfair competition, including restitution and restitutionary disgorgement, and for such other relief as the law permits.

### COUNT SIX — BREACH OF EXPRESS WARRANTY

132.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

133.    Plaintiff Del Barrio asserts this cause of action on behalf of himself and the California Class.

134.    Porsche is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

135.    With respect to leases, Porsche is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

136.     Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

137. Porsche made numerous representations, descriptions, and promises to Plaintiff and California Class members regarding the performance and emission controls of their vehicles.

138. Porsche, however, knew or should have known that its warranties were false and/or misleading. Porsche was aware that had manipulated emissions testing for the vehicles they sold to Plaintiffs and Class members and therefore, knew that the emission systems were not as warranted.

139. Porsche's conduct deceived Plaintiff Del Barrio and California Class members. Plaintiff and Class members reasonably relied on Porsche's warranties in purchasing and continuing to drive Class Vehicles. Plaintiff and Class members were unaware of Porsche's emissions-testing manipulation. Had they known the truth, they would not have acted as they did. Plaintiff and Class members would not have purchased vehicles whose high performance was only made possible through emissions fraud, or would have paid less for them.

140. Class Vehicles did not perform as was warranted. Unbeknownst to Plaintiff Del Barrio and California Class members, Porsche had manipulated emissions testing, and Class Vehicles emitted at higher levels. Accordingly, Porsche breached its express warranty by providing a product that differed from that which was promised.

141. Plaintiff Del Barrio and California Class members are the intended third-party beneficiaries of contracts, including implied warranties, between Porsche and dealerships. The dealerships were not intended to be the ultimate consumers of Class Vehicles and have no rights under the warranties made with the Class Vehicles; those warranties were designed for and intended to benefit the ultimate consumers—Plaintiff and Class members—only.

142. Any opportunity to cure the express breach is unnecessary and futile.

143. As a direct and proximate result of Porsche's breach of express warranties, Plaintiff and California Class members suffered significant damages and seek damages in an amount to be determined at trial.

**COUNT SEVEN — BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES**

144.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

145.    Plaintiff Del Barrio asserts this cause of action on behalf of himself and the California Class.

146.    Each class vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

147.    The express California Emissions Warranties generally provide "that the vehicle or engine is . . . [d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." *Id*. This provision applies without any time or mileage limitation. *See id*.

148.    The California Emissions Warranties also specifically warrant against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See id*.

149.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

150.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

151.    Plaintiff Del Barrio and California Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Porsche are refusing to accept them and delivery of the California Vehicles "cannot

reasonably be accomplished." Cal. Civ. Code § 1793.2(c). This complaint is written notice of nonconformity to Porsche and "shall constitute return of the goods." *Id.*

152.    Plaintiff Del Barrio and California Class members are the intended third-party beneficiaries of contracts, including implied warranties, between Porsche and dealerships. The dealerships were not intended to be the ultimate consumers of Class Vehicles and have no rights under the warranties made with the Class Vehicles; those warranties were designed for and intended to benefit the ultimate consumers—Plaintiff Del Barrio and California Class members—only.

153.    In addition to all other damages and remedies, Plaintiff Del Barrio and Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1). Any "third-party dispute resolution process" offered by Porsche does not relieve Porsche from the civil penalty imposed because Porsche is not offering the process to Class members for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant. *See* Cal. Civ. Code § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

### COUNT EIGHT — VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT

154.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

155.    Plaintiff Williams asserts this cause of action on behalf of himself and the New Jersey Class.

156.    Class Vehicles are "merchandise" under the meaning of N.J. Stat. Ann. § 56:8-1(c).

157.    Plaintiff Williams and New Jersey Class members and Porsche are "persons" as defined by N.J. Stat. Ann. § 56:9–1(d).

158.    Under New Jersey Consumer Fraud Act, "the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . .whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." N.J. Stat. Ann. § 56:9-2.

159.   Porsche's conduct constituted deception, fraud, false pretense, false promise, misrepresentation, and knowing concealment, suppression, and omission of material facts under the meaning of the Act.

160.   Porsche intended for Plaintiff Williams and New Jersey Class members to rely on Porsche's representations and omissions. Porsche's acts were done wantonly, maliciously, oppressively, and deliberately, with intent to defraud Plaintiff Williams and New Jersey Class members and in reckless disregard of Plaintiff Williams's and New Jersey Class members' rights, in order to enrich Porsche and allow it to sell its vehicles in the U.S. market.

161.   As a direct and proximate result of Porsche's violation, Plaintiff Williams and New Jersey Class members have been damaged. Plaintiff Williams and New Jersey Class members reasonably relied on the representations and omissions in purchasing and continuing to drive Class Vehicles. Plaintiff Williams and New Jersey Class members were unaware of Porsche's emissions-testing manipulation. Had they known the truth, they would not have acted as they did. Plaintiff Williams and New Jersey Class members would not have purchased vehicles whose high performance was only made possible through emissions fraud, or would have paid less for them.

162.   Plaintiff Williams and New Jersey Class members were injured by their reliance on Porsche's misrepresentations and omissions. Porsche's deception came at Plaintiff Williams and New Jersey Class members' expense. Plaintiff Williams and Class members have sustained damages because they purchased vehicles at an inflated cost and own vehicles that are diminished in value because of Porsche's deception. Plaintiff Williams and Class members have been damaged in an amount to be proven at trial, including but not limited to compensatory damages, incidental and consequential damages, and other damages allowed by law, including threefold the damages sustained

1   by Plaintiff Williams and New Jersey Class members, reasonable attorneys' fees, filing fees, and

2   reasonable costs of suit under N.J. Stat. Ann. § 56:9-19.

3   **COUNT NINE — VIOLATION OF N.J. STAT. ANN. § 12A:2–725 —BREACH OF EXPRESS**
4                                                **WARRANTY**

5   163.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of

6   this Complaint as if fully restated here.

7   164.    Plaintiff Williams asserts this cause of action on behalf of himself and the New Jersey

8   Class.

9   165.    Porsche "warrant[ed] to the owner of [Class Vehicles] that the automobile was

10  designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable

11

12  at the time of manufacture."

13  166.    Porsche's warranty was material to Plaintiff Williams's and New Jersey Class

14  members' decision to purchase and drive Class Vehicles. Porsche well knew that its customers,

15  including Plaintiff Williams and New Jersey Class members, valued Class Vehicles' high

16
    performance; that the Class Vehicles' performance was only made possible by cheating emissions
17
    testing; and that Porsche customers would not want performance procured through producing vehicles
18
    with higher emissions than test vehicles.
19

20  167.    Class Vehicles did not conform to their warranties. Porsche manipulated required

21  emissions testing of Class Vehicles to evade government emissions requirements. The transmissions in

22  the test vehicles were altered to cheat emissions-certification testing, so that the vehicles would show

23  lower emissions when tested than the Class Vehicles actually sold to consumers emit. The result was

24  as Porsche intended: vehicles passed emissions certifications by deliberately inducing misleading

25
    readings under test conditions. They were not in fact designed to conform at the time of sale with
26

27  emissions requirements.

28

168.    As a direct and proximate result of Porsche's breach, Plaintiff Williams and New Jersey Class members have been damaged. Plaintiff Williams and New Jersey Class members reasonably relied on Porsche's warranty in purchasing and continuing to drive Class Vehicles. Plaintiff Williams and New Jersey Class members were unaware of Porsche's emissions-testing manipulation. Had they known the truth, they would not have acted as they did. Plaintiff Williams and New Jersey Class members would not have purchased vehicles whose high performance was only made possible through emissions fraud, or would have paid less for them.

169.    Plaintiff Williams and New Jersey Class members were injured by their reliance on Porsche's misrepresentations and omissions. Porsche's deception came at Plaintiff Williams's and New Jersey Class members' expense. Plaintiff Williams and New Jersey Class members have sustained damages because they purchased vehicles as an inflated cost and own vehicles that are diminished in value because of Porsche's deception. Plaintiff Williams and New Jersey Class members have been damaged in an amount to be proven at trial, including but not limited to compensatory damages, incidental and consequential damages, and other damages allowed by law.

## X.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of Class members, respectfully request that the Court enter judgment in their favor and against Porsche, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining Porsche from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Costs, restitution, damages, rescission, and disgorgement in an amount to be determined at trial;

D.    For treble and/or punitive damages as permitted by applicable laws;

E.      An order requiring Porsche to pay both pre- and post-judgment interest on any amounts awarded;

F.      An award of costs and attorneys' fees; and

G.      Such other or further relief as may be appropriate.

## XI. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

DATED this 19th day of October, 2020.

KELLER ROHRBACK L.L.P.


By *s/ Matthew J. Preusch*
Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Gretchen Freeman Cappio, *pro hac vice* forthcoming
Ryan McDevitt, *pro hac vice* forthcoming
Adele A. Daniel *pro hac vice* forthcoming
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
adaniel@kellerrohrback.com


*Attorneys for Plaintiffs*